NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250604-U

NO. 4-25-0604

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 26, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| 3 MAGPIES, INC., an Illinois Corporation, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| SAM M. PIRRELLO JR.; LINDA C. PIRRELLO; and | ) | No. 17MR929 |
| UEP INVESTMENTS 2, LLC, an Illinois Limited | ) | |
| Liability Company, | ) | |
| Defendants | ) | Honorable |
| (UEP Investments 2, LLC, an Illinois Limited Liability | ) | Lisa R. Fabiano, |
| Company, Defendant-Appellant). | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices DeArmond and Grischow concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court reversed, finding that plaintiff could not prove unjust enrichment regarding defendant's retention of certain property where the lease between the two parties unambiguously gave defendant ownership of the property.

¶ 2   Plaintiff, 3 Magpies, Inc. (3 Magpies), leased premises located at 307 South Main Street in Rockford, Illinois, for the purpose of operating a restaurant. In renovating the premises, plaintiff purchased and installed a kitchen hood and multiple sinks (kitchen equipment). Following termination of its lease, plaintiff filed a complaint against the new owner of the property, defendant, UEP Investments 2, LLC (UEP), arguing that defendant was unjustly enriched by its retention of the kitchen equipment. The trial court found in favor of plaintiff and awarded $34,000 in damages. Defendant appeals, arguing the court erred in (1) the holding that the kitchen equipment was owned by plaintiff, (2) holding that UEP was unjustly enriched by the retention of

the kitchen equipment, and (3) calculating damages.

¶ 3        We agree with defendant and reverse.

¶ 4                        I. BACKGROUND

¶ 5        On June 3, 2015, plaintiff leased a portion of a commercial property located at 307 South Main Street in Rockford, Illinois, from defendants, Sam M. Pirrello Jr. and Linda C. Pirrello. Plaintiff's leased premises included the first floor of the building, one half of the building's basement, and the adjoining parking lot. The lease was set to run from July 1, 2015, to June 30, 2020, and included an option for plaintiff to extend the lease for an additional 60-month period and to have the right of first refusal should the Pirrellos decide to sell. The provision of the lease detailing this extension stated as follows:

> "Leesee [*sic*] may at Leesee's [*sic*] option, extend the term of this Lease for an additional sixty (60) month period by giving Lessor ninety (90) days advanced written notice prior to the termination date***. This option to extend may be exercised one (1) time for said five (5) year period."

Additionally, the lease contained the following provision regarding alterations to the building:

> "Lessee may make alterations, changes, additions or improvements to the premises, only after first obtaining Lessor's written consent, which consent Lessor agrees not to unreasonably withhold or delay. All such alterations, additions or improvements to the premises by the Lessee, shall become the property of the Lessor upon the expiration of the term of this Lease; provided, however, Lessor shall retain the right to require the Lessee to return the premises to its current condition at the termination of this Lease."

The lease further provided that if more than 40% of the leased premises were destroyed by fire or

other casualty, the Pirrellos could elect not to rebuild. In such a situation, the lease would be terminated as of the date of the casualty, with notice of the decision not to rebuild to be given to plaintiff within 45 days from the date of the casualty.

¶ 6        To prepare the premises for operation as a restaurant, the operator and part-owner of 3 Magpies, Stephanie Caltagerone, undertook substantial renovation efforts. These efforts included purchasing and installing a new kitchen hood and two kitchen sinks. Plaintiff's restaurant, called "Magpie," opened in December 2015.

¶ 7        On June 25, 2017, a fire occurred in the Hanley building at 301 South Main Street, next door to the Pirrellos's building. Although the Pirrellos's property did not catch fire, the firefighting efforts at the Hanley building resulted in significant damage to the leased premises. As a result, on August 4, 2017, the Pirrellos sent plaintiff a letter terminating its lease.

¶ 8        On October 10, 2017, plaintiff filed a verified complaint for declaratory action against the Pirrellos. Plaintiff argued that the Pirrellos had failed to make an effective termination of the lease because (1) they did not inform plaintiff of their decision not to rebuild within 45 days of the fire, as required by the lease and (2) less than 40% of the leased premises were destroyed, which, under the lease, prevented the Pirrellos from electing not to rebuild. Plaintiff asked the trial court to declare that the lease remained in effect due to the conditions for the termination of the lease not being met.

¶ 9        On October 13, 2017, the Pirrellos sold the property at 307 South Main Street to defendant for nominal consideration via quitclaim deed. Plaintiff subsequently amended its complaint to include claims against defendant for unjust enrichment and replevin. The complaint specifically alleged that Caltagerone had attempted on several occasions to remove the kitchen equipment from the premises and defendant had prevented her from doing so, claiming ownership.

¶ 10      Both the Pirrellos and defendant filed motions to dismiss. Ultimately, the following claims survived dismissal: (1) breach of lease against the Pirrellos for electing not to rebuild when less than 40% of the premises were damaged, failing to give timely notice of the decision not to rebuild, and failing to offer plaintiff the right of first refusal; (2) unjust enrichment against defendant; and (3) replevin against defendant. The parties proceeded to trial on these claims.

¶ 11      Caltagerone testified that when she first looked at the property it was "really gross" and "very outdated." She described the renovation work in the leased premises as "[j]ust a complete remodel." Although there had previously been a restaurant at the location, the former kitchen was "just an empty room with about two inches of grease" on the floor. Caltagerone explained, "All other fixtures from the previous tenant, it looked like they had just been sawn off and taken away. There was no hood. There was no exhaust fan. *** [T]he kitchen was empty, minus the walk-in cooler, which I also had to refurbish." Caltagerone testified that among the appliances she supplied for the restaurant were sinks and a range hood. The hood was specific to the cooking equipment that went underneath it, which Caltagerone owned. She estimated the cost of the hood was "over $10,000." She stated that she did not attach the hood with the intention that it would remain with the premises, but rather only as "a necessary requirement to opening a restaurant." However, on cross-examination, she acknowledged that she had intended 307 South Main Street to be the permanent location for the Magpie restaurant.

¶ 12      Caltagerone stated that on June 26, 2017, the day after the fire in the Hanley building, she reentered the Magpie restaurant and observed the damage to the property to be minimal. She remained in frequent contact with the Pirrellos for the next two months and stated that Sam "sounded as though he was making every intention to live up to the terms of the lease and restore the building." However, on August 2, 2017, she received a call from Sam informing

her that he had halted work on the building and would need to terminate her lease. At that time, he told her he did not know if he would rebuild. On August 4, 2017, she received a letter from the Pirrellos's attorney, terminating her lease.

¶ 13	Caltagerone returned to the premises in January 2018 in order to remove her property, including the hood and sinks. She testified that when she attempted to go into the kitchen, she was told by a UEP associate, "[ ']You can[']t take what's in that room. You don't need to go in the kitchen.[' ]"

¶ 14	The Magpie restaurant went out of operation for two years while Caltagerone looked for another space to lease. Eventually, the restaurant opened again in another location, which Caltagerone believed was inferior to the location on 307 South Main Street due to there being less foot traffic. She estimated she had lost profits in the amount of approximately $260,000. She reached this amount by taking the profits for her last month in business at the South Main Street address and multiplying it by the number of months remaining on the original lease period.

¶ 15	Plaintiff also presented testimony from an architect and a general contractor, both of whom testified that they observed less than 40% of the premises to be damaged after the fire.

¶ 16	After plaintiff rested, the Pirrellos and defendant moved for a directed verdict. Defendant specifically argued that there was no evidence that it was in possession of the kitchen equipment at issue, which would defeat a replevin claim, and there was also no evidence of damages to support an unjust enrichment claim. The trial court took the matter under advisement.

¶ 17	The following day, the trial court rejected defendant's motion. It stated,

"With regards to your motion, [defendant], I think you mainly rested on the damages issues. I think the replevin argument, you may have a point there. I think I'll need some more law on that point before I make a decision on the replevin. But

with regard to damages, there was some evidence with regards to the cost of the whole that I recall."

¶ 18        Sam Pirrello testified that the day after the fire, he walked through his property and observed that four large skylights in the building had been broken by falling debris, there was water in the upper floor, first floor, and basement, and the entire building smelled of smoke. He testified that the water throughout the building created a mold problem so severe that when he returned to the building 23 days after the fire, he and the restoration company he hired had to wear HAZMAT suits. As a result of the water damage, all of the electrical equipment in the building was removed, along with the tin ceilings, the heating and air-conditioning systems, and the flooring on the upper floor of the building, which he described as "buckled." Additionally, he stated that the building at 307 South Main Street shared a wall with the Hanley building, and, following the fire, "there was nothing structurally holding up that wall."

¶ 19        Sam testified that because no part of the building was usable, he considered the premises to be more than 40% damaged. Due to a lack of funds, he believed that demolition was his only option. He therefore sent a letter to Caltagerone on August 4, 2017, terminating her lease. Later, he transferred the property to defendant for "no consideration" since, at the time, he was "under multiple lawsuits" by the City of Rockford, requiring him to immediately begin repairing the building or demolishing it. He stated that he felt the building was "valueless. It was a liability."

¶ 20        Counsel for defendant asked Sam, "[W]as it your understanding that whatever improvements Ms. Caltagerone made that were attached to the property were something that was to stay there even when the lease was terminated?" Counsel for plaintiff objected on the grounds that the question was a misstatement of the lease. Counsel for plaintiff noted that the lease provided that all improvements to the property would become the property of the Pirrellos at the "expiration"

of the lease, rather than on the lease's "termination," as counsel for defendant had stated. Counsel for defendant asked Sam if the word clarification changed his answer, and Sam replied that it did not, agreeing with counsel's statement that "when a lease is terminated, the term is up."

¶ 21    Justin Fern, a real estate developer affiliated with defendant, testified that it was his understanding when he took title to the property that the kitchen hood was part of the building. When asked why, he explained that the hood was affixed to the property, it was challenging to install, removing it would have caused damage to the property, and it was connected to other components in the building, like fire suppression systems, the electrical system, and fans. He also believed that the sinks were a part of the building. Caleb Wilson, the vice president of development and commercial leasing for UEP, also testified that he believed the hood and sinks would be left with the property and not taken by plaintiff.

¶ 22    Defendant presented John Bross, a construction manager, as an expert on "the construction of building and how things go into a building." In a prepared report, Bross concluded that, in his opinion, the hood and sinks were fixtures that were part of the building. Regarding the hood, Bross came to this conclusion based on the fact that it was mounted to the building, it could not be removed without a demolition permit, a licensed professional would need to remove it, its removal would cause damage to the building, requiring repairs to the ceiling and exterior wall, it was configured so as to work in tandem with other appliances in the specific kitchen it was in, and certain other appliances could not be appropriately operated in a restaurant without the presence of a hood. Regarding the sinks, Bross testified that, while their removal was easier than that of the hood, it was still not simple because certain codes required them to be replaced quickly by a "liker-in-kind object."

¶ 23    Following the trial, the parties submitted posttrial briefs. The trial court announced

its ruling at a later hearing. It found that the Pirrellos had given timely notice to Caltagerone to terminate plaintiff's lease and that more than 40% of the building was destroyed. The court further noted that, even if it found the Pirrellos had breached the lease, plaintiff had failed to establish damages because Caltagerone's estimate of her lost profits was speculative and "woefully inadequate to establish lost profits with reasonable certainty." It found that plaintiff had also failed to establish damages with respect to its claim for breach based on its right of first refusal because it did not present the court a valuation of the property after it had sustained damage following the fire.

¶ 24       With respect to plaintiff's claims against defendant, the trial court stated that the issue before it concerned whether the kitchen equipment should be classified as fixtures or trade fixtures. The court found that both the hood and the sinks were trade fixtures and, thus, could be taken off of the property by plaintiff. The court therefore found that plaintiff had proven its claim of unjust enrichment against defendant. It stated,

> "[Defendant] *** got *** these trade fixtures that were relatively new. They were able to lease the premises to another restaurant. I think it's reasonable to presume that the fact that it already had a hood and sinks there was a selling point for anyone leasing the restaurant, and so they got the value over the last, you know, eight years or so of the use. They also have a different restaurant that's in there now, the use of this hood and the two sinks. So I believe that Plaintiff has established a claim for unjust enrichment and that they're entitled to get a judgment against [defendant] for the hood—and the stove hood and the sinks in the amount of $34,000, and I will enter judgment in that amount in favor of Plaintiff and against [defendant]."

The court further stated that it found in favor of defendant for the replevin count but did not offer

any further explanation.

¶ 25        This appeal followed.

¶ 26                                II. ANALYSIS

¶ 27        On appeal, defendant argues that the trial court's finding in favor of plaintiff on its unjust enrichment claim was in error. Specifically, defendant argues that (1) the language of the lease between plaintiff and the Pirrellos unambiguously granted defendant ownership of the kitchen equipment, irrespective of its classification as either a fixture or trade fixture, (2) defendant was not unjustly enriched by retention of the kitchen equipment, and (3) plaintiff failed to prove damages.

¶ 28        Defendant's first argument requires us to interpret the lease between plaintiff and the Pirrellos. "Under Illinois law, a lease is an agreement subject to the law of contracts." *Housing Authority of Champaign County v. Lyles*, 395 Ill. App. 3d 1036, 1039 (2009). In construing a contract, our primary objective is to give effect to the intention of the parties. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). To determine the parties' intent, we first look to the language of the contract itself. *Id.* If the words in the contract are clear and unambiguous, they must be given their plain and ordinary meaning. *Id.* "A contract must be construed as a whole, viewing each provision in light of the other provisions. [Citation.] The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract." *Id.* The construction of a lease is question of law subject to *de novo* review. *Housing Authority of Champaign County*, 395 Ill. App. 3d at 1039.

¶ 29        The alteration provision in the lease between the Pirrellos and plaintiff provided as follows:

        "All such alterations, additions or improvements to the premises by the Lessee,

shall become the property of the Lessor upon the expiration of the term of this Lease; provided, however, Lessor shall retain the right to require the Lessee to return the premises to its current condition at the termination of this Lease."

Defendant argues that this language unambiguously grants ownership of the kitchen equipment to UEP. Plaintiff disagrees, arguing that the lease creates a distinction between the date of the lease's "termination" and "expiration," which determines when ownership of the property passed to the Pirrellos. Because Caltagerone attempted to remove the kitchen equipment on January 9, 2018, which was after the lease's termination by the Pirrellos, but before the original lease term was set to end on June 30, 2020, plaintiff argues that the property had not yet passed to the Pirrellos at the time Caltagerone attempted to remove it.

¶ 30       Plaintiff's argument is premised on the idea that the parties intended "termination" and "expiration" to have different meanings in the lease's alteration provision. Plaintiff notes that courts have recognized a distinction between the two terms. See *Weill v. Centralia Service & Oil Co.*, 320 Ill. App. 397, 402 (1943) ("The word 'terminate,' employed in connection with a lease, connotes a conclusion and severance of the relationship of landlord and tenant prior to the expiration of the term of the lease by the efflux of time."). Plaintiff argues that because the parties chose to use both words in defining their duties when the lease ended, we should interpret the use of each word as describing a different event.

¶ 31       We disagree and find that the lease, when read as a whole, shows the two words were to be treated as synonyms. The alteration provision at issue must be read within the context of other provisions in the lease. See *Thompson*, 241 Ill. 2d at 441. In another section of the lease, concerning plaintiff's option to extend the lease, the lease provides as follows:

"Leesee [*sic*] may at leesee's [*sic*] option, extend the term of this Lease for

an additional sixty (60) month period by giving Lessor ninety (90) days advanced written notice prior to the *termination* date\*\*\*. This option to extend may be exercised one (1) time for said five (5) year period." (Emphasis added).

¶ 32　　　　This language clearly shows the parties used the phrase "termination date" to mean the end of the original five-year lease term, what plaintiff claims on appeal is only the "expiration date." As such, we are unconvinced by plaintiff's argument that the parties intended the two words to refer to distinct events in a different provision of the lease.

¶ 33　　　　We further find that the language of the alteration provision itself demands a reading of the two words as synonyms. Specifically, the alteration provision states that all alterations, improvements, or additions to the premises become the property of the Pirrellos at the lease's end. It then qualifies this statement with a semicolon, followed by the addition of the following language: "*provided, however*, Lessor shall retain the right to require the Lessee to return the premises to its current condition at the termination of this lease." (Emphasis added). The use of the semicolon here, combined with the qualifying words "provided, however," suggests that the two statements should be read in tandem as referencing the same event. In other words, the event that gives rise to the lessor's ownership of any alterations, additions, or improvements to the premises (lease expiration) is the same event that would allow the lessor to demand the space be returned to its current condition (lease termination).

¶ 34　　　　Considering the language used in the alteration provision and the lease as a whole, we conclude that the terms "termination" and "expiration" were intended to be treated as synonyms within the lease. Accordingly, we agree with defendant that the language of the alteration provision unambiguously granted the Pirrellos ownership of "[a]ll such alterations, additions or improvements to the premises" at the time the lease was terminated on August 4, 2017. Because

plaintiff does not contend on appeal that the kitchen equipment was outside of the category of "additions, alterations or improvements to the premises," we conclude that the Pirrellos had ownership of the kitchen equipment at the time they transferred the property at South Main Street to defendant. Accordingly, plaintiff cannot establish an unjust enrichment claim against defendant regarding defendant's retention of the kitchen equipment. As a final note, because the lease does not distinguish between trade or regular fixtures, we find the trial court erred in conducting this analysis.

¶ 35                                    III. CONCLUSION

¶ 36            For the reasons stated, we reverse the trial court's judgment.

¶ 37            Reversed.